**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-03638-STV

PILLOW MENU, LLC,

      Plaintiff,

v.

SUPER EFFECTIVE, LLC and
JERRY GUO,

      Defendants.

---

## ORDER

Entered By Magistrate Judge Scott T. Varholak

      This civil action is before the Court on: (1) Plaintiff's Motion for Injunctive Relief to Freeze the Assets of Defendants (the "Motion for Injunction") [#20], and (2) Defendants' Motion to Dismiss Second Amended Complaint ("the Motion to Dismiss") [#45] (collectively, the "Motions").  The parties have consented to proceed before this Court for all proceedings, including the entry of final judgment, pursuant to 28 U.S.C. § 636(c) and D.C.COLO.LCivR 72.2.  [#51, 52]  The Court has carefully considered the Motions and related briefing, the entire case file, and the applicable case law, and the arguments presented at the Hearing on June 9, 2021.  For the following reasons, both the Motion for Injunction and the Motion to Dismiss are **DENIED.**

## I.    BACKGROUND[1]

This case arises out of an alleged joint venture between Plaintiff Pillow Menu, LLC and Defendants Super Effective, LLC ("Super Effective") and Jerry Guo. [#38, ¶ 6] Plaintiff is a Colorado limited liability company with its principal place of business in Colorado. [*Id.* at ¶ 1] Plaintiff has two members, Craig Clark and Abigail Clark; both are citizens of Colorado. [*Id.* at ¶ 2] Super Effective was formed in March 2020 as a Delaware limited liability company with its principal place of business in California. [*Id.* at ¶ 3] Mr. Guo, who is a citizen of California, is the chief executive officer ("CEO") and sole member of Super Effective. [*Id.* at ¶¶ 4-5]

On June 22, 2020, Plaintiff and Super Effective entered into a Joint Venture Agreement (the "Agreement") for the purpose of supplying the North Carolina Division of Emergency Management ("NC DPS") 7.5 million pairs of nitrile gloves. [*Id.* at ¶ 10; #20-3] Pursuant to the Agreement, Plaintiff was to be "the finance partner," which would "provide all capital for the Joint Venture" and also was "responsible for handling the administrative and logistical requirements to complete the Joint Venture." [#20-3 at 1; *see also* #38, ¶ 11] Super Effective was "responsible for the sales process and

---

[1] The facts are drawn from the allegations in Plaintiff's Second Amended Complaint [#38] and the evidence submitted by the parties in support of the Motions. As explained below, the Court considers the evidence submitted by the parties solely for purposes of resolving the Motion for Injunction and Defendants' challenge to venue. For purposes of Defendants' motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court considers only the allegations in the Second Amended Complaint, which the Court accepts as true, and "documents incorporated into the complaint by reference." *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009); *see also GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997) ("[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss.").

communications with [NC] DPS."  [#20-3 at 1; *see also* #38, ¶ 11]  The Agreement specified that Plaintiff would receive payment from NC DPS and then would be "entitled to its costs to fulfill the Purchase Order" from NC DPS and "[t]he remaining amount [would] be deemed profit and profit [would] be split evenly between [Plaintiff] and Super Effective." [#20-3 at 1; *see also* #38, ¶ 12]  The Agreement further provided that Plaintiff would "retain the right, in perpetuity, to 5% of any deals between Super Effective and/or any venture involving [Mr. Guo] and State of North Carolina."  [#20-3 at 1]  Mr. Guo "agree[d] that he shall personally as an individual be jointly and severally liable for any damages caused to [Plaintiff] for any breach of [the] Agreement by Super Effective."  [*Id.*; *see also* #38, ¶ 13]  Mr. Guo signed the Agreement in both his individual capacity and as the CEO of Super Effective and Mr. Clark signed the Agreement as the Managing Member of Plaintiff. [#20-3 at 2]

On July 8, 2020, Plaintiff and Super Effective entered into the First Allonge to Joint Venture Agreement (the "First Allonge"), which amended the Agreement to include a purchase order from the State of Washington and a second purchase order from the state of North Carolina.  [#38, ¶ 14; #20-4]  More specifically, the First Allonge states that "[t]he [A]greement shall include [the Washington purchase order and the second North Carolina purchase order] on the same terms and conditions as the prior purchase order . . . with the State of North Carolina."  [#20-4; *see also* #38, ¶ 14]  The First Allonge further states that Plaintiff "shall retain the right, in perpetuity, to 5% of any deals between Super Effective and/or any venture involving [Mr. Guo] and State of Washington."  [*Id.*]

On October 30, 2020, Super Effective received a purchase order from the Emergency Response section of the Minnesota Health Department for 10 million nitrile

examination gloves to be delivered within seven business days from the receipt of the purchase order.  [#20-6 at 1; #20-14]  In late October and early November 2020, Mr. Guo and Mr. Clark exchanged messages on the WhatsApp application regarding Plaintiff participating in the fulfillment of the Minnesota purchase order.  [#20-2, ¶ 5; #20-5]  On November 3, 2020, Mr. Clark sent Mr. Guo a WhatsApp message proposing the following:

> Here is what we'll do. 1) On MN we'll update our agreement with the following:  a) we ship the 2.8 million ASAP, b) super effective pays us back the cost of the gloves plus shipping immediately upon getting paid by MN out of the first payment they get, c) once the full MN PO is paid out we pay out the profits independent of NC, d) for all future orders with MN we write down our framework of 5 percent where we don't participate or 50/50 where we participate.

[#20-5 at 9]  Mr. Clark then stated:  "If we're good order shipping ASAP and [sic] draft it up.  Then we need to figure out a plan to put NC to bed once and for all."  [*Id.*]  Mr. Guo responded regarding the North Carolina account, and Mr. Clark then proposed that they:  "1) Get MN going as it's time sensitive, 2) clear up NC current problems, 3) get NC remaining gloves.  End State is close out all open POs while hopefully keeping customers happy."  [*Id.* at 9-10]  Mr. Guo responded, "ok sounds like a plan."[2]  [*Id.* at 10]

On November 3, 2020, Omar Velayudhan, a Wholesale Manager for Plaintiff, sent Mr. Guo a proposed Third Allonge to Joint Venture Agreement (the "Proposed Third Allonge"), based upon the Minnesota Purchase Order.  [#20-6 at 2; #20-9; #20-13]   The

---

[2] The Second Amended Complaint alleges that, on November 3, 2020, the parties agreed to amend the Agreement to include the Minnesota purchase order with the following terms:  (1) Plaintiff shall ship 2.8 million nitrile gloves to Minnesota at its own expense, and Super Effective shall "wire the actual cost of 2.8 million gloves plus shipping [Plaintiff] paid, to [Plaintiff] within 24 hours of receipt of funds from the State of Minnesota;" (2) "Super Effective shall fill the remainder of the [Minnesota purchase order] at its sole cost and expense;" and (3) within five business days of receiving final payment from Minnesota, Super Effective shall reconcile the profit from the Minnesota purchase order independent of the other joint ventures between the parties and provide Plaintiff its 50 percent share of the profit from the Minnesota purchase order.  [#38, ¶ 15]

Proposed Third Allonge sent to Mr. Guo had already been signed by Chelsea Duckham, as the CEO of Plaintiff.  [#20-6 at 2; #20-9 at 2]  Mr. Velayudhan testifies that, after sending the email with the Proposed Third Allonge, he called Mr. Guo on Mr. Guo's cell phone to request that he sign the Proposed Third Allonge.  [#20-6 at 2]  According to Mr. Velayudhan, Mr. Guo told him that Mr. Guo was rushing to the bank at the time to sign a wire related to the Minnesota purchase order, but that Mr. Guo "ensured that he would sign the agreement when he was at a place where he could."  [*Id.*]  Mr. Velayudhan further testifies that, during the telephone call, Mr. Guo "emphasized that it was imperative that there was no delay in shipping the supplies [to Minnesota] as the purchase order listed a one week delivery timeline."[3]  [*Id.*]  Mr. Velayudhan testifies that he "took Mr. Guo's word that he would promptly sign the agreement and proceeded to route the Inventory [Plaintiff] paid for to [Minnesota]."  [*Id.*]

On November 4, 2020, Mr. Velayudhan sent Mr. Guo an email asking Mr. Guo to sign and return the Proposed Third Allonge.  [#20-13 at 2]  According to Mr. Velayudhan, on November 10, 2020, Mr. Guo communicated with Mr. Velayudhan via telephone and told Mr. Velayudhan that the Proposed Third Allonge should be titled "second allonge to joint venture agreement" and requested that Mr. Velayudhan make that correction and send the proposed allonge back to him.  [#20-6 at 2]  On November 12, 2020, Mr. Velayudhan sent Mr. Guo an email that stated:  "I corrected this to the second instead of the third.  Can you sign and return today?"  [#20-13 at 4]  The email attached a pdf file, consisting of a document titled "Draft Second Allonge to Joint Venture Agreement" (the

---

[3] In the Second Amended Complaint, Plaintiff alleges that Defendants "represented that they would promptly execute the Second Allonge while insisting that [Plaintiff] expedite delivery of product to the State of Minnesota to meet the requirements of the State."  [#38, ¶ 16]

"Disputed Second Allonge").  [#20-6 at 2; #20-13 at 4; #20-10]  The Disputed Second Allonge was not signed by Plaintiff or Mr. Guo.  [#20-10; #43-4]  Mr. Velayudhan sent follow-up emails to Mr. Guo on November 17 and November 30, 2020, requesting that Mr. Guo sign and return the Disputed Second Allonge.  [#20-6 at 2; #20-13 at 5-6]

According to Mr. Velayudhan, on December 1, 2020, Mr. Velayudhan called Mr. Guo and Mr. Guo confirmed that Super Effective had received the full payment from Minnesota pursuant to the purchase order but that Mr. Guo "stated that he was withholding payment [to Plaintiff] unless [Plaintiff] agreed to unilaterally absorb nearly $400,000 in losses in the joint venture agreement to supply product to North Carolina." [#20-6 at 2]  On that same date, Mr. Guo sent an email to Mr. Velayudhan, requesting that Mr. Velayudhan send Mr. Guo a copy of the parties' original agreement and "a .doc [of the Disputed Second Allonge] so [Mr. Guo could] redline the second allonge."  [#20-13 at 7]  Mr. Guo further stated in the email that he would "be more comfortable signing a second allonge if it was the same text as the first allonge, unless this second allonge is able to include the fact that Super Effective Health is not liable for the Malaysia loss (which [Mr. Clark and Mr. Guo] had a phone conversation in August about)."  [*Id.*]

Mr. Clark testifies that he was under the belief that Mr. Guo had signed the Disputed Second Allonge until December 2, 2020, when employees of Plaintiff informed him that Mr. Guo had not signed the Disputed Second Allonge.  [#20-2, ¶ 7]  According to Mr. Clark, he "would never have allowed the transaction [with Minnesota] to move forward without having the terms of the transaction memorialized in writing."  [*Id.*] According to Mr. Clark, as of November 4, 2020, Plaintiff supplied $435,271.00 worth of gloves and shipping to fulfill the Minnesota purchase order, and Super Effective was paid

$1,332,000.00 by Minnesota.[4]  [*Id.* at ¶ 8]  Plaintiff alleges that the total profit for the Minnesota purchase order was $95,150.00.  [#38, ¶ 20]  To date, Super Effective has not reimbursed Plaintiff for its actual costs associated with shipping nitrile gloves to Minnesota or shared any of the profit from the Minnesota purchase order with Plaintiff.  [#20-2, ¶ 8; #38, ¶ 21]

Plaintiff also alleges that it provided capital and shipped goods to Washington pursuant to the Washington purchase order.  [#38, ¶ 17]  Plaintiff alleges that Plaintiff's costs to fulfill the Washington purchase order was $133,236.00, that Super Effective was paid $137,500.00 by Washington, and thus that the profit for the Washington purchase order was $4,264.00.  [*Id.* at ¶¶ 18, 19]  Plaintiff further alleges that Super Effective failed to reimburse Plaintiff for its actual costs to fulfill the Washington purchase order and failed to share the profits received from the Washington purchase order.  [*Id.* at ¶ 21]  Mr. Clark testifies that "[t]he total . . . Mr. Guo and [Super Effective] owe [Plaintiff] not taking into account the current losses or potential profit on the North Carolina joint venture and damages to [Plaintiff] by Mr. Guo's fraud is $618,924.00."[5]  [#20-2, ¶ 12]

On December 11, 2020, Plaintiff filed a complaint against Super Effective and Mr. Guo.  [#1]  On December 22, 2020, Plaintiff filed an Amended Complaint for Damages and Jury Demand.  [#10]  On March 30, 2021, Plaintiff filed another Amended Complaint for Damages and Jury Demand (the "Second Amended Complaint"), which is the operative complaint.  [#38]  The Second Amended Complaint asserts three claims for

---

[4] According to Mr. Velayudhan, Plaintiff "funded $376,050.00 to fulfill [the Minnesota purchase order]."  [#20-6 at 2]

[5] In the Second Amended Complaint, Plaintiff alleges that Plaintiff "has suffered damages in the amount of $618,578.50 . . . calculated based on the actual costs incurred by [Plaintiff] and the share of profit owed."  [#38, ¶ 23]

7

relief:  (1) breach of contract against both Super Effective and Mr. Guo; (2) fraud against both Super Effective and Mr. Guo; and (3) respondeat superior against Super Effective. [*Id.*]

On January 11, 2021, Plaintiff filed the Motion for Injunction, seeking to freeze Defendants' assets.  [#20]  On April 9, 2021, Defendants filed a response in opposition to the Motion for Injunction.  [#43]  On April 26, 2021, Plaintiff filed a reply in support of the Motion for Injunction.  [#48]  On May 18, 2021, Defendants file a sur-reply in further opposition to the Motion for Injunction.  [#57]

On April 13, 2021, Defendants filed the Motion to Dismiss, arguing that the District of Colorado is an improper venue for Plaintiff's claims and that the Second Amended Complaint fails to state a claim.  [#45]  On May 4, 2021, Plaintiff filed a response in opposition to the Motion to Dismiss.  [#53]  On May 18, 2021, Defendants filed a reply in support of the Motion to Dismiss.  [#58]  On June 9, 2021, the Court conducted a hearing on the Motion for Injunction and Motion to Dismiss and ordered the parties to submit supplemental briefing regarding Defendants' contention that this District is an improper venue for Plaintiff's claims.  [#60]  On June 17, 2021, Plaintiff submitted a supplemental response [#61], and Defendants submitted a supplemental response on June 18, 2021 [#62].

## II.   ANALYSIS

Defendants' Motion to Dismiss argues two grounds for dismissal:  (1) improper venue pursuant to Federal Rule of Civil Procedure 12(b)(3); and (2) failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).[6]  [#45]  Because it may not be

---

[6] Defendants also argue that Plaintiff's fraud claim is not pled with particularity as required by Federal Rule of Civil Procedure 9(b).  "A dismissal for failure to plead fraud with

appropriate for this Court to consider the merits of Plaintiff's request for preliminary injunction absent proper venue in this Court,[7] the Court first addresses Defendants' argument that this Court is not a proper venue for Plaintiff's claims and then turns to Defendants' arguments that Plaintiff's Second Amended Complaint fails to state a claim. Finally, the Court addresses Plaintiff's Motion for Injunction.

### A.    Venue

#### 1.    Legal Standard

Pursuant to Federal Rule of Civil Procedure 12(b)(3), a defendant may seek dismissal for improper venue.  "Once venue is challenged, it is the plaintiff's burden to show that venue is proper in the forum district." *Scott v. Buckner Co.*, 388 F. Supp. 3d 1320, 1324 (D. Colo. 2019) (quoting *Hanson v. Bosley & Bratch, Inc.*, 2018 WL 4491424, at *3 (D. Colo. Sept. 18, 2018)).  "[A] plaintiff may rest on the well-pled facts in the complaint to oppose a motion to dismiss for improper venue, but only to the extent that such facts are uncontroverted by defendant's evidence." *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1260 (10th Cir. 2012) (quotation omitted).  The Court thus "may examine facts outside the complaint to determine whether its venue is proper." *Id.* at 1260-61 (10th Cir. 2012) (quoting 5B Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. § 1352,

---

sufficient particularity under [Rule] 9(b) is reviewed under the same standards as a Rule 12(b)(6) dismissal." *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1118 n.5 (10th Cir. 1997).
[7] *See, e.g., Al Hada v. Pompeo*, No. CV188002DMGJPRX, 2018 WL 6264999, at *1 (C.D. Cal. Sept. 17, 2018) ("A district court lacks authority to grant preliminary injunctive or mandamus relief if venue is improper."); *Proctor & Gamble Co. v. Ranir, LLC*, No. 1:17-CV-185, 2017 WL 3537197, at *4 (S.D. Ohio Aug. 17, 2017) ("[I]t is reversible error to address injunctive relief prior to a claim of improper venue" (emphasis omitted)); *C & A Plus, Inc. v. Pride Sols., LLC*, No. CIV. A3-02-118, 2003 WL 25278133, at *1 (D.N.D. Feb. 7, 2003) ("Before the court can enter into a discussion on the preliminary injunction motion raised by plaintiffs, it must first determine whether there is personal jurisdiction over defendant and whether venue is proper.").

at 324 (2004)).  "[T]he court must draw all reasonable inferences and resolve all factual

conflicts in favor of the plaintiff."  *Id.* at 1261 (quoting 5B Charles Alan Wright & Arthur R.

Miller, Fed. Prac. & Proc. § 1352, at 324 (2004)).  "If the defendant presents evidence

that venue is improper and the plaintiff responds with contrary evidence," the Court may

either "hold [the] Rule 12(b)(3) motion in abeyance until [it] holds an evidentiary hearing

on the disputed facts" or "deny the Rule 12(b)(3) motion while granting leave to refile it if

further development of the record eliminates any genuine factual issue."  *Id.* (quotation

omitted).

### 2.    Application

The  federal  venue  statute,  28  U.S.C.  §  1391,  "govern[s]  the  venue  of  all  civil

actions brought in district courts of the United States . . . without regard to whether the

action is local or transitory in nature."  28 U.S.C. § 1391(a).  Pursuant to that statute,

venue properly lies in:

> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;
>
> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or
>
> (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b).[8]  Here, Plaintiff seeks to establish this Court's venue pursuant only

to Section 1391(b)(2), arguing that "a substantial part of the underlying events took place

---

[8] "The Federal Courts Jurisdiction and Venue Clarification Act of 2011 relocated the venue provisions from § 1391(a) to § 1391(b)."  *Cox v. Sullivan*, No. 14-CV-206-TCK-FHM, 2014 WL 4352088, at *1 n.2 (N.D. Okla. Sept. 2, 2014) (citing Pub. L. No. 112–63, 125 Stat. 758 (2011)).  As relevant here, in the context of an assertion of venue pursuant to Section 1391(b)(2), "the 2011 amendments create a distinction without a difference."  *Al-Ghena*

in [the District of Colorado]."  [#53 at 5; *see also* #38, ¶ 9 (alleging that "venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2)")]

Venue pursuant to Section 1391(b)(2) "is not limited to the district with the *most* substantial events or omissions." *Emps. Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1165 (10th Cir. 2010) (emphasis in original).  Instead, it "contemplates that venue can be appropriate in more than one district . . . [and] permits venue in multiple judicial districts as long as a substantial part of the underlying events took place in those districts." *Id.* at 1166 (quoting *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 356 (2d Cir.2005)).  In considering a challenge to venue under Section 1391(b)(2), the Court conducts a two-part analysis. *Id.*  First, the Court "examine[s] the nature of the plaintiff's claims and the acts or omissions underlying those claims." *Id.*  Second, the Court "determine[s] whether substantial 'events material to those claims occurred' in the forum district."  *Id.* (quoting *Gulf Ins. Co.*, 417 F.3d at 357).  "The substantiality requirement is satisfied upon a showing of acts and omissions that have a close nexus to the alleged claims."  *Id.* (quotation omitted).

Because Defendants argue—and Plaintiff does not dispute—that venue must be "analyzed separately—and thus must be proper—as to each claim" [#45 at 11 (citing *Premier Grp., Inc v. Bolingbroke*, No. 15-CV-01469-PAB-CBS, 2015

---

*Int'l Corp. v. Radwan*, 957 F. Supp. 2d 511, 519 n.6  (D.N.J. 2013).  Thus, although the parties and certain of the cases cited herein sometimes refer to Section 1391(a)(2) rather than 1391(b)(2), the Court construes them—and refers to them herein—as references to the current version of the statute, Section 1391(b)(2).

WL 4512313, at *4 (D. Colo. July 27, 2015)], the Court evaluates venue as to each

of Plaintiff's claims in turn.[9]

### a.    Breach of Contract Claim

As noted above, in the first step of the venue analysis, the Court considers "the

nature of the plaintiff's claims and the acts or omissions underlying those claims."  *Emps.*

*Mut. Cas. Co.*, 618 F.3d at 1166.  Plaintiff's first claim for relief alleges that Defendants

breached their agreements with Plaintiff by "failing to reimburse Plaintiff for actual costs

incurred in fulfilling the Purchase Orders for the State of Washington and State of

Minnesota and in failing to equally share the Profit received for these Purchase Orders

with Plaintiff."  [#38, ¶ 28; *see also id.* at ¶ 29]  Under Colorado Law, a breach of contract

claim requires: (1) existence of a contract; (2) performance by the plaintiff; (3) failure to

perform by the defendant; and (4) damages.[10]  *Shell v. Am. Family Rights Ass'n*, 899 F.

---

[9] The Court notes that some courts, including courts in this jurisdiction, have applied the doctrine of pendent venue, which provides that when venue is properly established as to one claim, the court may exercise pendent or ancillary venue over other, related claims. *See* 14D Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. § 3808 (4th ed.); *Jackson v. MCI Telecommunications Corp.*, No. CIV.A. 92-2503-GTV, 1993 WL 408332, at *2 (D. Kan. Sept. 29, 1993).  Because, for the reasons that follow, the Court finds that it has venue over each of the three claims asserted in the Second Amended Complaint, the Court finds it unnecessary here to consider the applicability of pendent venue.

[10] "[A] federal court sitting in diversity must apply the substantive law of the state in which it sits, including the forum state's choice-of-law rules."  *Boyd Rosene & Assocs., Inc. v. Kan. Mun. Gas Agency*, 123 F.3d 1351, 1352-53 (10th Cir. 1997).  Here, the parties do not address the choice of law issues potentially implicated by the fact that Plaintiff and Defendants were located in different states throughout the parties' business relationship and the agreements at issue do not contain choice of law provisions.  [*See, e.g.*, #38, ¶¶ 2-4; #20-3; #20-4]  In their analysis of the claims, however, Plaintiff and Defendants both apply Colorado law.  [*See* #45 at 15-16, 18-19; #53 at 9-16]  For purposes of the instant Motions, the Court thus also applies Colorado law.  *See In re Korean Air Lines Disaster*, 932 F.2d 1475, 1495 (D.C. Cir. 1991) ("Unlike jurisdictional issues, courts need not address choice of law issues *sua sponte*."), *cited in Flying J Inc. v. Comdata Network, Inc.*, 405 F.3d 821, 831 n.4 (10th Cir. 2005); *Brown v. Bob Moore Auto Grp., L.L.C.*, No. CIV-19-409-R, 2019 WL 3976848, at *5 n.4 (W.D. Okla. Aug. 22, 2019) ("Courts typically

Supp. 2d 1035, 1058 (D. Colo. 2012) (citing *Western Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992)).

Defendants contend that "the events and omissions giving rise to plaintiff's non-payment claim are orders being filled (in Washington and Minnesota), Defendants purportedly receiving payment (sent from Washington and Minnesota to California), and Defendants allegedly deciding (in California) not to make payments to Plaintiff."[11] [#58 at 4]  The Court disagrees that "the acts or omissions underlying" Plaintiff's breach of contract claim are so limited.  In the context of claims for breach of contract, courts "consider a number of factors, including where the contract was negotiated or executed, where it was to be performed, and where the alleged breach occurred."  *Biad Chili, Co. v.*

---

do not raise choice of law issues *sua sponte* where the parties have acquiesced to the application of a particular state's laws.").

[11] Defendants contend that "it is *Defendants'* conduct, not Plaintiff's, that informs the venue analysis."  [#45 at 13 (emphasis in original)]  In support, Defendants cite an unpublished decision in which the Tenth Circuit stated that "venue statutes are generally designed for the benefit of defendants, and in determining what events or omissions give rise to a claim, the 'focus [is] on relevant activities of the defendant, not of the plaintiff.'" *Goff v. Hackett Stone Co.*, 185 F.3d 874, 1999 WL 397409, at *1 (10th Cir. 1999) (unpublished table decision) (quoting *Woodke v. Dahm*, 70 F.3d 983, 985 (8th Cir.1995)); *see also Greene v. Inglewood Hous. Auth.*, No. 18-CV-01042-GPG, 2018 WL 10373650, at *3 (D. Colo. May 8, 2018) (quoting *Goff*).  In a subsequent, published decision, however, the Tenth Circuit acknowledged that "courts have disagreed over whether to focus solely on the activities of the defendant or to consider the activities of the plaintiff as well" and declined to "definitively answer th[e] question."  *Emps. Mut. Cas. Co.*, 618 F.3d at 1166 n.11.  There thus is no binding authority and "the law . . . is divided whether to examine solely Defendants['] or Plaintiff's actions in undertaking [the venue] analysis." *RV Horizons, Inc. v. Smith*, No. 1:18-CV-02780-NYW, 2019 WL 1077366, at *5 (D. Colo. Mar. 7, 2019); *cf. Karl W. Schmidt & Assocs., Inc. v. Action Env't Sols., LLC*, No. 14-CV-00907-RBJ, 2014 WL 6617095, at *4 (D. Colo. Nov. 21, 2014) (finding venue proper in Colorado, in part, because "much of the plaintiff's performance under the contract . . . occurred in Colorado").  Because, for the reasons that follow, the Court finds that substantial events relevant to Plaintiff's claims occurred in this District even if the Court limits its consideration to Defendants' own conduct, the Court finds it unnecessary to resolve whether Plaintiff's conduct also is relevant to the Court's analysis of venue.

*Cimarron Agric., Ltd.*, No. CV-08-967 WJ/WPL, 2009 WL 10698485, at *2 (D.N.M. Mar.

31, 2009) (quoting *PI, Inc. v. Quality Prod., Inc.*, 907 F. Supp. 752, 757 (S.D.N.Y. 1995)).

Here, Plaintiff alleges:

> [Plaintiff's headquarters in Colorado] served as the headquarters and distribution center for the activities of the Parties to include processing orders relating to the Joint Venture, managing drop shipments to the clients of the Parties, physically receiving and shipping product relating to the claims, doing accounting for the Parties['] activities, scheduling all shipments of products to be delivered to clients, doing banking for the joint venture and raising funds to pay for the Parties['] activities.

[#38, ¶ 9] Plaintiff further contends that Defendants "contacted Plaintiff in Plaintiff's home

State of Colorado to execute [the parties' agreements] and to arrange for the provisions

of protective equipment to North Carolina, Washington, and Minnesota."[12]   [#53 at 6-7]

The Court finds that the following acts and omissions of Defendants also underlie

Plaintiff's breach of contract claim:  (1) contacting Plaintiff in Colorado to propose and

then negotiate the terms of the parties' agreements, (2) communicating with Plaintiff in

Colorado concerning Plaintiff's performance under the agreements, including Mr. Guo's

communications with Mr. Velayudhan, who was located in Colorado, encouraging him to

ship the product needed to fulfill the Minnesota purchase order [#20-6 at 2], and (3) failing

to make the payments allegedly required under the agreements to Plaintiff in Colorado.

Turning to the second step of the venue analysis, the Court considers whether

"substantial events material to" Plaintiff's breach of contract claim occurred in the District

of Colorado.  *Emps. Mut. Cas. Co.*, 618 F.3d at 1166 (quotation omitted).  Defendants

contend that none of the substantial events material to Plaintiff's breach of contract claim

---

[12] Although not expressly alleged in the Second Amended Complaint, the affidavits and documentary evidence submitted by Plaintiff is consistent with this contention and Defendants do not dispute it.  [*See, e.g.*, #20-2; #20-6; #20-13]

occurred in Colorado, because "Plaintiff's claims are based on Defendants' (purported) decision—made in California—not to make payments to Plaintiff for purchase orders fulfilled in Washington and Minnesota." [#45 at 6-7]  The Court's venue analysis, however, "look[s] . . . not to a single 'triggering event' prompting the action, but to the entire sequence of events underlying the claim." *Uffner v. La Reunion Francaise, S.A.*, 244 F.3d 38, 42 (1st Cir. 2001), *cited in Emps. Mut. Cas. Co.*, 618 F.3d at 1166.  The Court's analysis thus is not constrained to where Defendants' breach occurred but rather must consider "the entire sequence of events underlying the [contract] claim." *Emps. Mut. Cas. Co.*, 618 F.3d at 1167 (quotation omitted); *see also Cosa Xentaur Corp v. Bow*, No. 13-CV-2912 JS ARL, 2014 WL 1331030, at *7 (E.D.N.Y. Mar. 31, 2014) ("Venue may be proper in the district where the contract was substantially negotiated, drafted, and/or executed, even if the contract was not to be performed in that district and the alleged breach occurred elsewhere." (quotation omitted)).

Looking to the entire sequence of events, the Court finds that "[t]here is little question that a substantial part of the events giving rise to the claim occurred" in Colorado. *Edison Tr. No. One v. Pattillo*, No. 10-1159-RDR, 2010 WL 5093831, at *9 (D. Kan. Dec. 8, 2010).  Defendants reached out to Plaintiff in Colorado to negotiate the alleged agreements and to ensure Plaintiff's performance of the agreements.  This conduct is particularly important to the breach of contract claim here, where Plaintiff alleges that certain of Defendants' contractual obligations were "established in writing by text message and orally to Plaintiff" [#38, ¶ 29] and Defendants dispute the existence of those obligations [#45 at 15].  In addition, although Defendants' decision not to make the payments allegedly due under the parties' agreements may have been made in California,

the payment allegedly was due to Plaintiff in Colorado.  Numerous courts—in and outside

of the Tenth Circuit—have found venue proper under similar circumstances.[13]  *See, e.g.*,

*Edison Tr. No. One*, 2010 WL 5093831, at *9 (finding venue proper in Kansas where

Texas defendants "pursued the Kansas [plaintiffs] and then negotiated with them through

communications to Kansas" and where payments under the contract were allegedly due

in Kansas); *KBA N. Am. Inc. v. Amerigraph, LLC*, No. 1:07-CV-118, 2007 WL 4119119,

at *3 (D. Vt. Nov. 16, 2007) (finding venue proper in Vermont where the agreement was

at least in part negotiated, prepared, and entered by the plaintiff in Vermont and the

defendant failed to make payment to plaintiff's office in Vermont); *Concert Water Techs.,*

*Inc. v. Hughes*, No. CIV.A. 10-1398-MLB, 2011 WL 765878, at *2 (D. Kan. Feb. 25, 2011)

(finding venue proper in Kansas where defendants "negotiated their separate contracts

through phone calls and e-mails with [the plaintiff] in Kansas," the plaintiff "authorized

---

[13] Defendants' reliance on *Transport Funding, LLC v. HVH Transportation, Inc.* is misplaced.  [#45 at 13 (citing No. 2:17-CV-2106-JAR-GLR, 2017 WL 4223126 (D. Kan. Sept. 22, 2017)); #58 at 4, 5]  In *Transport Funding*, the plaintiff corporation, which had moved from Missouri to Kansas after the formation of the contract in dispute, brought a lawsuit for breach of contract in Kansas against a Colorado company.  2017 WL 4223126, at *4.  The plaintiff in *Transport Funding* argued that venue was appropriate in Kansas, because the defendant communicated with the plaintiff in Kansas regarding compliance with the terms of the agreement and the alleged breach.  *Id.* at *4.  The court ultimately found that it did not have venue over the breach of contract claim, because contract formation was not at issue and "[f]or communications to be sufficient to confer venue, they must be more than general business communications."  *Id.*  The court further emphasized that the alleged breaches—failure to make payment and failure to return trucks in the required condition—did not occur or fail to occur in Kansas.  *Id.*  By contrast, here, Defendants' communications with Plaintiff in Colorado—including communications that allegedly constitute the agreement and communications that placed pressure on Plaintiff to take actions in Colorado—are central to the dispute.  *See CITGO Petroleum Corp. v. Wilburn Oil Co.*, No. 08-CV-053-TCK-TLW, 2009 WL 10687965, at *6 (N.D. Okla. Apr. 28, 2009) (collecting cases for the proposition that "the simple transmittal of letters, facsimiles, e-mails, and telephone calls to a forum during either negotiation and/or execution of a contract are considered to be substantial enough events for the purposes of venue").

payments from Kansas" and "defendants allegedly [we]re in possession of [the Kansas plaintiff's] intellectual property"); *Value Chain Sols., LLC. v. Quality One Wireless, LLC*, No. 09-2586-JAR, 2010 WL 1643690, at *6 (D. Kan. Apr. 20, 2010) (finding venue proper in Kansas where "[t]he contract was allegedly formed in Kansas, it was at least partially performed in Kansas, and defendants had contacts with Kansas in the form of mailings, emails, and telephone communications"); *Stocking v. Simonovich*, No. 1:19-CV-00021, 2020 WL 2736093, at *1, 5 (D. Utah May 26, 2020) (finding venue proper in Utah where "all terms of the business relationship and contracts between [d]efendants and [p]laintiff were negotiated via email, text message, or phone call with [p]laintiff while he was in the State of Utah").

In sum, "[e]ven if a substantial part of the events giving rise to [P]laintiff's [breach of contract] claim took place in [California where Defendants were located], a substantial part of the events also took place in [Colorado]." *Value Chain Sols., LLC.*, 2010 WL 1643690, at *6. The Court thus finds that the District of Colorado is a proper venue for Plaintiff's breach of contract claim.

### b.  Fraud Claim

Plaintiff's second claim for relief asserts a claim for fraud against Defendants based upon Mr. Guo's alleged representations to Plaintiff that: (1) Super Effective would immediately wire funds to Plaintiff upon receipt of payment from Minnesota to reimburse Plaintiff for the costs associated with its partial fulfillment of the Minnesota purchase order; (2) Super Effective would split any profits resulting from the Minnesota purchase order with Plaintiff; and (3) Mr. Guo would sign the Second Allonge on behalf of Super Effective. [#38, ¶¶ 33-45]  Under Colorado law:

> [To establish fraud, a plaintiff] must show that the defendant made a false representation of a material fact, knowing that representation to be false; that the person to whom the representation was made was ignorant of the falsity; that the representation was made with the intention that it be acted upon; and, that the reliance resulted in damage to the plaintiff.

*Coors v. Sec. Life of Denver Ins. Co.*, 112 P.3d 59, 66 (Colo. 2005).  The relevant acts and omissions for Plaintiff's fraud claim thus are Mr. Guo's statements to Plaintiff regarding Plaintiff's participation in the Minnesota purchase order.

In their reply in support of the Motion to Dismiss, Defendants argue that the Second Amended Complaint "fails to allege the geographic location of the purported fraud which . . . means that venue cannot be ascertained from the allegations in the [Second Amended Complaint]." [#58 at 9]  The Court disagrees.  In the Second Amended Complaint, Plaintiff alleges that it is based in Colorado and that its operations related to its joint venture with Defendants were conducted in Colorado.  [#38, ¶¶ 1, 9]  In response to the Motion to Dismiss, Plaintiff stated that "Defendants contacted Plaintiff in . . . Colorado to execute [the parties' agreements] and to arrange for the provisions of protective equipment to North Carolina, Washington and Minnesota" [#53 at 6-7] and submitted evidence consistent with that contention [#20-2; #20-6; #20-13].  Defendants have not submitted any evidence to refute that contention.  [*See* #58]  The Court thus finds that it is reasonable to infer that Mr. Guo's statements were made to Plaintiff's representatives located in Colorado and, as noted above, at this stage, the Court "must draw all reasonable inferences and resolve all factual conflicts in favor of [Plaintiff]."  *Hancock*, 701 F.3d at 1261 (quotation omitted).

Numerous courts have found that venue for a fraud claim properly lies in the district to which the alleged misrepresentations were directed.  *See, e.g.*, *Trois v. Apple Tree*

*Auction Ctr., Inc.*, 882 F.3d 485, 494 (5th Cir. 2018) (holding that "the misrepresentations directed at Texas [we]re a substantial part of the events giving rise to the alleged fraud" and thus "the Texas district court [wa]s a proper venue for the fraud claim"); *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 153 (2d Cir. 2001) (finding venue proper in New York where the defendant "directed communications to New York"); *Hodgson v. Roper*, No. 2:20-CV-00650-KJM-DB, 2020 WL 5039405, at *6 (E.D. Cal. Aug. 26, 2020) (finding venue proper where "plaintiff's claims primarily ar[o]se out of allegedly fraudulent communications made by individual defendants from outside of [the forum state] to [someone] . . . residing in [the forum state]"); *Nabong v. Paddayuman*, 289 F. Supp. 3d 131, 136 (D.D.C. 2018) ("It is well settled that, when particular communications made to or from the District of Columbia form the basis of a claim like fraud, that the communications constitute a 'substantial part of the events' giving rise to the claim and that, therefore, venue in the District is proper."); *Multi-Media Int'l, LLC v. Promag Retail Servs.*, 343 F. Supp. 2d 1024, 1033 (D. Kan. 2004) (finding venue over Plaintiff's claims for fraud and violation of RICO proper in Kansas where claims based upon "mailings, faxes, and one telephone conversation between [d]efendants in California and [p]laintiff in Kansas").

Accordingly, drawing all reasonable inferences in favor of Plaintiff, the Court finds that substantial events material to Plaintiff's fraud claim occurred in this District, because Mr. Guo's alleged misrepresentations were directed at Plaintiff in Colorado.  The Court thus finds that the District of Colorado is a proper venue for Plaintiff's fraud claim.

### c.      Respondeat Superior Claim

Plaintiff's third claim for relief asserts a claim for respondeat superior, alleging that Mr. Guo's actions were undertaken as an agent for Super Effective and thus that Super Effective "is liable for the breach of contract and fraud committed by its agent, Defendant Guo, and is responsible for the losses and damages to Plaintiff." [#38, ¶¶ 45-50] "[R]espondent superior is a form of imputed liability," pursuant to which "the employer's duty is dependent on and derivative of the employee's conduct." *Ferrer v. Okbamicael*, 390 P.3d 836, 843 (Colo. 2017).

Plaintiff's respondeat superior claim thus is derivative of Plaintiff's claims for breach of contract and fraud. Accordingly, the Court finds that the District of Colorado is a proper venue for Plaintiff's respondeat superior claim for the same reasons articulated above that the Court found this to be a proper venue for Plaintiff's breach of contract and fraud claims.

### 3.      Conclusion

The Court thus concludes that venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) for all three of the claims asserted in Plaintiff's Second Amended Complaint and the Motion to Dismiss is therefore DENIED to the extent it seeks dismissal for improper venue.

### B.      Failure to State a Claim

In addition to arguing improper venue, the Motion to Dismiss also seeks the dismissal of all three of Plaintiff's claims for relief for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).[14] [*See generally* #45] After setting forth the

---

[14] As noted above, with regard to Defendants' motion to dismiss for failure to state a claim, the Court considers only the allegations in the Second Amended Complaint, which the

applicable legal standard, the Court considers the sufficiency of the allegations as to each of Plaintiff's claims.

### 1.    Legal Standard

Pursuant to Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  In deciding a motion under Rule 12(b)(6), a court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff."  *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (alteration in original) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)).  Further, "the court must liberally construe the pleadings and make all reasonable inferences in favor of the [plaintiff]."  *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1105 (10th Cir. 2017).  Nonetheless, a plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  Plausibility refers "to the

---

Court accepts as true, and "documents incorporated into the complaint by reference." *Smith*, 561 F.3d at 1098; *see also GFF Corp.*, 130 F.3d at 1384 ("[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss."). More specifically, in addition to the allegations in the Second Amended Complaint, the Court considers the Agreement and the First Allonge as those executed agreements are central to Plaintiff's claims and the parties do not dispute the authenticity of the copies of those agreements filed by Defendants with their Motion to Dismiss.  [#45 at 5-6, 8; *see also* #20-3, #20-4]  The Court does not consider the other evidence submitted by the parties in connection with Defendants' venue challenge and the Motion for Injunction. The Court thus need not convert Defendants' motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) into a motion for summary judgment pursuant to Rule 56.  *See Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010)

scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570). "The burden is on the plaintiff to frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief." *Id.* (quoting *Twombly*, 550 U.S. at 556). The Court's ultimate duty is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

Pursuant to Federal Rule of Civil Procedure 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." "Rule 9(b) does not, however, require the pleading of detailed evidentiary matter, nor does it require any particularity in connection with an averment of intent, knowledge, or condition of mind." *Trussell v. United Underwriters, Ltd.*, 228 F. Supp. 757, 774 (D. Colo. 1964). To meet the particularity requirements of Rule 9(b), a plaintiff must "set forth the time, place and contents of the false representation[s], the identity of the party making the false statements and the consequences thereof." *George v. Urban Settlement Servs.*, 833 F.3d 1242, 1254 (10th Cir. 2016) (quotation omitted). "[I]n determining whether a plaintiff has satisfied Rule 9(b), courts may consider whether any pleading deficiencies resulted from the plaintiff's inability to obtain information in the defendant's exclusive control." *Id.* at 1255.

### 2.      Breach of Contract Claim

"To plead a breach of contract in Colorado, a plaintiff must allege '(1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff.'" *Romstad v. City of Colorado Springs*, 650 F. App'x 576, 580 (10th Cir. 2016) (quoting *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992)).  In the Second Amended Complaint, Plaintiff alleges that Defendants: (1) "breached their obligations outlined in the [Agreement] and subsequent Allonges, including but not limited to, failing to reimburse Plaintiff for actual costs incurred in fulfilling the Purchase Orders for the State of Washington and State of Minnesota and failing to equally share the Profit received for these Purchase Orders with Plaintiff," and (2) "breached their contractual obligations established in writing by text message and orally to Plaintiff from November to December 2020 by failing to reimburse Plaintiff for the actual costs incurred in fulfilling the Purchase Orders for the State of Washington and the State of Minnesota and in failing to equally share the Profit received for these Purchase Orders with Plaintiff."  [#38, ¶¶ 28, 29] Defendant seeks dismissal of Plaintiff's breach of contract claim only to the extent it is based upon a breach of the Disputed Second Allonge, relating to the Minnesota purchase order.[15]  [#45 at 15-16; #58 at 6-8]

---

[15] Defendant's Motion to Dismiss thus does not appear to seek dismissal of Plaintiff's breach of contract claim to the extent it is premised upon: (1) breaches related to the Washington purchase order, or (2) breaches of the Agreement, the First Allonge, or agreements established through text messages and oral communications.  The Motion to Dismiss contends that "[n]o valid agreement is alleged with respect to the Minnesota purchase order" and that the breach of contract claim thus should be dismissed "[a]s to the Minnesota purchase order."  [#45 at 16]  Defendants' argument in the Motion to Dismiss and reply in support of the Motion to Dismiss, however, addresses only the draft Disputed Second Allonge and makes no reference—or argument—specific to Plaintiff's allegations that the parties reached agreements as to the Minnesota purchase order

More specifically, Defendants argue that the unsigned, Disputed Second Allonge "includes a term that [the parties] would not be bound [by it] absent a fully executed (and delivered) written contract, which the [Second Amended Complaint] alleges never occurred." [#45 at 15-16]  Defendants' argument is premised entirely upon a provision of the unsigned Disputed Second Allonge submitted by Defendant with its Motion to Dismiss.  [*See* #45 at 15-16; #45-2 at 10-11]  Importantly, this alleged provision of the Disputed Second Allonge requiring the agreement to be executed and delivered before becoming effective is not alleged in the Second Amended Complaint.  [*See* #38]  Defendants contend that the Court may nonetheless consider this provision in resolving their motion to dismiss for failure to state a claim, because "Plaintiff relies on this document for its claims."  [#45 at 15 n.7]  The Court disagrees.  As an initial matter, the parties have submitted two different versions of the Disputed Second Allonge—one titled "Third Allonge to Joint Venture Agreement" that is signed by Ms. Duckham on behalf of Plaintiff and one titled "Second Allonge to Joint Venture Agreement" that is not signed by either party.  [*See* #45-2 at 10-11; #20-9 at 2]  Defendants have submitted the unsigned version for the Court's consideration, but Plaintiff alleges in the Second Amended Complaint that it "promptly executed the Second Allonge."  [#38, ¶ 16]  It thus is not clear

---

through text messages and oral communications.  [*See* #38, ¶ 29]  Accordingly, the Motion to Dismiss is DENIED to the extent Defendants seek dismissal of Plaintiff's breach of contract claim related to the Washington purchase order and the agreements the parties allegedly reached with regard to the Minnesota purchase order through text messages and oral communications.  *See United States v. Ray*, 899 F.3d 852, 858 (10th Cir. 2018) (finding that party waives argument where it "fails to develop or provide any authority for [it]"); *Drake v. City of Fort Collins*, 927 F.2d 1156, 1159 (10th Cir. 1991) (stating that "the court will not construct arguments or theories for the plaintiff in the absence of any discussion of those issues")

that either of the documents submitted by the parties is the document actually referred to in the Second Amended Complaint.

Nor is it clear that Plaintiff's claim for a breach of the parties' agreements with regard to the Minnesota purchase order is based upon the unsigned Disputed Second Allonge as distinguished from the parties' alleged agreements reached in text messages and oral communications.  In the Second Amended Complaint, Plaintiff alleges that "[o]n November 3, 2020, the parties agreed to amend the Agreement (Second Allonge to Joint Venture Agreement) to include a Purchase Order from the State of Minnesota . . . , with [certain] terms."  [*Id.* at ¶ 15]  Plaintiff does not allege that the unsigned, Disputed Second Allonge constitutes that agreement.  [*Id.*]  Similarly, although Plaintiff's response to the Motion to Dismiss indicates that the unsigned, Disputed Second Allonge embodies the parties' agreement, Plaintiff acknowledges that it was not signed by Defendants and instead argues that the agreements Defendants allegedly breached were "agreed to by text message and on the phone."[16]  [#53 at 9]

The Court thus concludes that the allegations in the Second Amended Complaint do not make clear that the Disputed Second Allonge submitted by Defendants with their Motion to Dismiss is central to Plaintiff's breach of contract claim.  Nor is it clear from the allegations in the Second Amended Complaint or the parties' briefing that the version of

---

[16] That the parties may have subsequently discussed formalizing their agreements in writing does not necessarily render their agreements ineffective.  "[T]he mere intention to reduce an oral or informal agreement to writing, or to a more formal writing, is not of itself sufficient to show that the parties intended that until such formal writing was executed the parol or informal contract should be without binding force."  *I.M.A., Inc. v. Rocky Mountain Airways, Inc.*, 713 P.2d 882, 888 (Colo. 1986) (quoting *Coulter v. Anderson*, 144 Colo. 402, 409–10, 357 P.2d 76, 80 (1960)).

the Disputed Second Allonge submitted by Defendants is an indisputably authentic copy of the Disputed Second Allonge that is referenced in the Second Amended Complaint. Accordingly, the Court finds that it may not consider the Disputed Second Allonge submitted by Defendants in connection with their motion to dismiss for failure to state a claim. Because Defendants' argument for dismissal of Plaintiff's breach of contract claim pursuant to Rule 12(b)(6) is premised entirely upon a provision contained in the unsigned, Disputed Second Allonge that was not alleged in the Second Amended Complaint, the Court further finds that it may not consider Defendants' argument for dismissal at this stage of the proceedings.

Accordingly, the Motion to Dismiss is DENIED to the extent it seeks dismissal of Plaintiff's breach of contract claim for failure to state a claim pursuant to Rule 12(b)(6).

### 3.    Fraud Claim

To successfully state a claim for fraud, a plaintiff must allege that:

[1] the defendant made a false representation of a material fact, [2] knowing that representation to be false; [3] that the person to whom the representation was made was ignorant of the falsity; [4] that the representation was made with the intention that it be acted upon; and, [5] that the reliance resulted in damage to the plaintiff.

*Coors*, 112 P.3d at 66.  The fifth element of a fraud claim "require[es] the plaintiff to prove separately actual reliance, the reasonableness of that reliance, and that the plaintiff's reliance caused its damages."  *Bristol Bay Prods., LLC v. Lampack*, 312 P.3d 1155, 1160 (Colo. 2013) (citing CJI-Civ. 19:1 (2013)).  Defendants contend that Plaintiff's fraud claim should be dismissed because: (1) Plaintiff allegedly failed to plead the claim with particularity as required by Rule 9(b); (2) Plaintiff has not and cannot allege justifiable reliance; and (3) Plaintiff's fraud claim is impermissibly based upon Defendants' alleged

non-performance of a promise of future conduct.   [#45 at 16-17; 18-19] The Court addresses each argument in turn.

### a.        Rule 9(b) Particularity Requirement

As noted above, to meet the particularity requirements of Rule 9(b), a plaintiff must "set forth the time, place and contents of the false representation[s], the identity of the party making the false statements and the consequences thereof."  *George*, 833 F.3d at 1254.  Defendants acknowledge that Plaintiff's fraud claim is premised upon Mr. Guo's agreement "to the terms stated in [the Disputed Second Allonge] and that he would sign it," but contend that "the 'when, where and how' are unclear" and thus that Plaintiff has not stated its fraud claim with particularity.  [#45 at 17]

Although Plaintiff's allegations in support of the fraud claim do not specify the specific date on which Mr. Guo's alleged misrepresentations were made, as Defendants concede, the alleged misrepresentations all relate to the parties' alleged agreements with respect to the Minnesota purchase order and Mr. Guo's alleged representation that he would sign the Disputed Second Allonge.   [#38, ¶¶ 33-45]   The Second Amended Complaint alleges that the parties reached an agreement with regard to including the Minnesota purchase order in their joint venture on November 3, 2020, and that the parties engaged in text message and oral communications regarding the Minnesota purchase order from November 2020 through December 2020.  [*Id.* at ¶¶ 15, 29]  Plaintiff filed the instant lawsuit on December 11, 2020. [#1]  Plaintiff thus plausibly alleges that the alleged misrepresentations were made by Mr. Guo between November 3, 2020, and December 11, 2020.   The Court finds such allegations sufficient to satisfy the particularity requirement of Rule 9(b) with regard to when the alleged misrepresentations were made.

*See Wells v. Johnson & Johnson*, No. CIV-20-1301-R, 2021 WL 3578191, at *4 (W.D. Okla. Aug. 12, 2021) (collecting cases for the proposition that "Fed. R. Civ. P. 9(b) does not require a plaintiff to specify the *exact* time and place that the alleged fraud occurred.").

With regard to where the alleged misrepresentations were made, Defendants complain that Plaintiff "fail[s] to identify any geographic location, as contemplated by the requirement to state a place."  [#58 at 9]  Although the Court agrees that Plaintiff has not alleged the specific location of Plaintiff's representatives when they received Mr. Guo's alleged misrepresentations, Plaintiff alleges that it is a corporation based in Colorado and that all of its operations related to the parties' joint venture were conducted in Colorado. [#38, ¶¶ 2, 9]  The location of Mr. Guo at the time he made the alleged misrepresentations to Plaintiff in text message and oral communications is likely information that is within the exclusive control of Defendants and thus may not have been available to Plaintiff at the time of pleading.  *See George*, 833 F.3d at 1255.

With regard to how the alleged misrepresentations were made, Plaintiff alleges in the Second Amended Complaint that the parties communicated by text message and orally [#38, ¶ 29] and, in its response to the Motion to Dismiss, Plaintiff contends that the representations were made "in accordance with their usual methods of communication, phone and email" [#53 at 13].  Defendants appear to accept that these statements are sufficient to describe the method of transmission of the alleged misrepresentations generally but argues that Plaintiff "fails to identify the means of communication for any *specific* statement purportedly constituting fraud" and that the statements "are so vague that it is not even clear how many statements are at issue."  [#58 at 9]  Although Plaintiff has not identified with specificity the statements Mr. Guo made (such as by quoting a text

message or telephone conversation), Plaintiff has alleged the specific substance of the alleged misrepresentations—*i.e.*, Plaintiff alleges that Mr. Guo "represented to Plaintiff that he agreed to the terms of the Second Allonge regarding the Purchase Order for the State of Minnesota, that the State of Minnesota would pay Super Effective, and that Super Effective would wire the funds owed to Plaintiff immediately" and that "he would sign the Second Allonge on multiple occasions." [#38, ¶ 37]

The Court thus agrees that Plaintiff's fraud claim is not alleged with precision and it is a close call, but the Court ultimately concludes that Plaintiff's allegations in support of its fraud claim are sufficient to satisfy Rule 9(b)'s particularity requirement. Notably, "Rule 9(b) does not require omniscience; rather the Rule requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim." *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012), *cited in George*, 833 F.3d at 1257. Here, the allegations are sufficient to provide Defendant notice that the fraud claim is based upon communications Mr. Guo had with Plaintiff by telephone, text message, and email between November 2020 and December 2020 regarding the Minnesota purchase order in which Mr. Guo allegedly made representations about when and how Plaintiff would be paid for its participation in the Minnesota purchase order and Mr. Guo's alleged assurances that he would sign the Disputed Second Allonge. Although Plaintiff obviously could have included additional factual information about the specific communications that form the basis of its fraud claims, "Defendant[s] may obtain a more detailed account of the basis for Plaintiff's fraud allegations through discovery." *Caddell v. Citibank, Delaware*, No. CV 04-2403-GTV, 2005 WL 8160419, at *3 (D. Kan. Jan. 25, 2005); *see also Manhattan Const. Co. v. Degussa Corp.*, No. CIV-06-611-M,

2007 WL 983084, at *1 (W.D. Okla. Mar. 29, 2007) ("Rule 9(b) does not require particularity to the degree so as to supplant general discovery methods." (quotation omitted)).

The Court thus concludes "that [Plaintiff's] allegations, at this stage and taken as a whole, sufficiently apprise[ ]" Defendants of the fraud claims being asserted against them. *George*, 833 F.3d at 1257 (10th Cir. 2016).

### b.    Justifiable Reliance

Defendants also argue that Plaintiff's fraud claim should be dismissed because Plaintiff "does not, and cannot, allege justifiable reliance." [#45 at 18] "A party's reliance on a purported misrepresentation is not justified when the party is aware of or on inquiry notice of the falsity of the representation." *Rocky Mountain Expl., Inc. v. Davis Graham & Stubbs LLP*, 420 P.3d 223, 234 (Colo. 2018). Defendants contend that "[b]ecause the [unsigned, Disputed] Second Allonge made clear that it would not become effective unless fully executed and delivered, it was objectively unreasonable for Plaintiff to have treated the document as a binding contract." [#45 at 18] Defendants' argument is entirely premised upon a provision contained in the version of the Disputed Second Allonge submitted with their Motion to Dismiss that, for the reasons explained above, the Court finds that it may not consider on a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6). The provision at issue was not alleged—or even referenced—in the Second Amended Complaint.[17] The Court thus finds that it may not consider Defendants' argument at this stage of the proceedings.

[17] Moreover, Plaintiff alleges in the Second Amended Complaint that Mr. Guo agreed to specific terms—as distinguished from agreeing to agree to specific terms in the future—and represented that he would sign the Disputed Second Allonge. [#38, ¶¶ 15, 37] At the time of these representations by Mr. Gao, the parties had been engaged in a joint

### c.      Fraud Based Upon a Promise

Defendants argue that Plaintiff's fraud claim "fail[s] for the further reason that non-performance of a promise of future conduct . . . is not actionable."  [#45 at 18-19 (citing *State Bank of Wiley v. States*, 723 P.2d 159, 160 (Colo. Ct. App. 1986) (finding that fraud "cannot be predicated upon the mere non-performance of a promise or contractual obligation . . . or upon failure to fulfill an agreement to do something at a future time")).[18] Although the Court agrees that a claim for fraud may not be based upon the mere nonperformance of a contractual promise, "a promise concerning a future act, when coupled with a present intention not to fulfill that promise, can be actionable fraud."  *H & H Distribs., Inc. v. BBC Int'l, Inc.*, 812 P.2d 659, 662 (Colo. App. 1990); *see also Salba Corp. v. X Factor Holdings, LLC*, No. 12-CV-01306-REB-KLM, 2014 WL 4458891, at *3 (D. Colo. Sept. 10, 2014) (finding that allegations that party knowingly made false representations concerning its present intention to perform a future act sounded in fraud).  Plaintiff here alleges exactly that—*i.e.*, that Defendants represented to Plaintiff that Defendants would reimburse Plaintiff's expenses and share any profit with Plaintiff and that Mr. Guo would sign the Disputed Second Allonge, even though Defendants "never

---

venture together for over four months.  [*Id.* at ¶¶ 10, 15]  It is not clear from the allegations in the Second Amended Complaint that the draft Disputed Second Allonge with the provision relied upon by Defendants had even yet been drafted at the time that Plaintiff relied upon Mr. Guo's alleged misrepresentations.  The Court thus cannot say as a matter of law at this stage of the proceedings that Plaintiff's reliance was unjustified.  *See Young v. Kiewit Corp.*, No. 17-CV-01251-WYD-MEH, 2018 WL 3382928, at *4 (D. Colo. Jan. 25, 2018) ("Whether a party's reliance is justified is generally a question of fact.").

[18] The facts of *State Bank of Wiley* are inapposite.  In *State Bank of Wiley*, the party bringing a fraud claim against a bank argued that the bank "by its past course of conduct in renewing and extending [the party's] loans, impliedly promised to continue to do so in the future."  723 P.2d at 160.  The alleged fraud there thus was based upon an implied promise to take action in the future, whereas here Plaintiff alleges that Defendants made specific, express promises with the express intent not to actually fulfill those promises.

had any intent to pay Plaintiff" and "never intended to sign the [Disputed] Second Allonge." [#38, ¶¶ 37, 39, 40]

The Court thus finds that Plaintiff has plausibly alleged its fraud claim based upon the allegations that Mr. Guo made certain promises to Plaintiff with the specific intent not to actually perform the promises.

### d.   Conclusion

Accordingly, the Court finds that Plaintiff has plausibly alleged a claim for fraud and satisfied the particularity requirement of Rule 9(b) and the Motion to Dismiss thus is DENIED to the extent it seeks to dismiss Plaintiff's fraud claim for failure to state a claim pursuant to Rule 12(b)(b) and Rule 9(b).

### 4.   Respondeat Superior Claim

"The doctrine of respondeat superior provides that an employer may be held vicariously liable for an employee's torts when the act is committed within the course and scope of employment."  *Colo. Comp. Ins. Auth. v. Jones*, 131 P.3d 1074, 1079-80 (Colo. App. 2005).  "To establish a defendant's liability under the doctrine, the plaintiff must show that an employer-employee relationship existed and that the act occurred in the course and scope of employment."  *Id.* at 1080.  The Motion to Dismiss argues that Plaintiff's respondeat superior claim should be dismissed because it "is wholly duplicative of the first two causes of action."[19]  [#45 at 19]  More specifically, Defendants contend that, because Plaintiff's breach of contract and fraud claims are asserted against both Super

---

[19] Defendants also argue that the respondeat superior claim should be dismissed because it is derivative of Plaintiff's underlying breach of contract and fraud claims and those claims fail to state a claim for relief.  [#45 at 20]  Because, for the reasons articulated above, the Court finds that the Second Amended Complaint has stated claims both for breach of contract and fraud, this argument fails.

Effective and Mr. Guo, the respondeat superior claim "adds nothing." [*Id.*]  The Court disagrees.  Although Plaintiff's first two causes of action are asserted against both defendants, Plaintiff includes additional factual allegations in support of the respondeat superior claim that are not included in the allegations in support of the first two claims for relief.  Moreover, although Defendants argue that "[t]he only mention in the [Second Amended Complaint] of anyone connected to Super Effective is Mr. Guo, and there are no allegations regarding conduct outside of his authority or scope of employment" [#58 at 10-11], Defendants' defense against Plaintiff's claims is not bound by the allegations in the Second Amended Complaint and thus Super Effective may ultimately assert a defense contending that Mr. Guo was acting outside of the scope of his employment.  Defendant has cited no authority—and the Court is aware of none—that precludes Plaintiff from anticipating this potential defense and proactively pleading a respondeat superior theory of recovery.[20]

### C.    Motion for Injunction

#### 1.    Legal Standard

In order to obtain a preliminary injunction, the moving party must prove:  "(1) a substantial likelihood of success on the merits of the case; (2) irreparable injury to the movant if the preliminary injunction is denied; (3) the threatened injury to the movant outweighs the injury to the other party under the preliminary injunction; and (4) the injunction is not adverse to the public interest."  *Kikumura v. Hurley*, 242 F.3d 950, 955 (10th Cir. 2001).  "As a preliminary injunction is an extraordinary remedy, the right to relief

---

[20] Indeed, none of the cases cited by Defendants in the Motion to Dismiss involved a respondeat superior claim and Defendants cite no authority at all in support of their arguments in their reply brief.  [#45 at 19-20; #58 at 10-11]

must be clear and unequivocal." *Schrier v. Univ. Of Co.*, 427 F.3d 1253, 1258 (10th Cir. 2005) (quotation omitted).

"[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). The Federal Rules of Evidence thus do not apply in the context of a preliminary injunction motion and the Court "may consider sworn proof including affidavits, including those based upon information and belief or hearsay (though it may affect the weight given), depositions, transcripts of prior hearings and live testimony." *Pharmanex, Inc. v. HPF*, 221 F.3d 1352, 2000 WL 703164, at *3 (10th Cir. 2000) (unpublished table decision); *APS BioGroup, Inc. v. Sterling Tech., Inc.*, No. 1:19-CV-02952-RM-MEH, 2020 WL 5406128, at *3 (D. Colo. Sept. 9, 2020) (citing *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003)).

## 2. Application

Through the Motion for Injunction, Plaintiff "requests that Defendant Super Effective's Wells Fargo account ending in 1495, all other bank accounts owned by Defendants, all payables due to Defendants held by third parties, all inventory, and all other assets be immediately ordered frozen by the Court pending resolution in this case." [#20, ¶ 13] Defendants argue, *inter alia*, that the Court "lacks authority to issue the preliminary injunction requested by Plaintiff." [#43 at 11] The Court agrees.

In *Deckert v. Independence Shares Corporation*, purchasers of certificates that required the holders to invest in a trust of common stocks sued, among others, the company that sold the certificates and the company that administered the trust, alleging fraudulent misrepresentations and concealment in violation of the Securities Act of 1933.

311 U.S. 282, 284-85 (1940).  The plaintiffs further alleged that the company that sold the certificates was "insolvent and threatened with many lawsuits, that its business [wa]s virtually at a standstill because of unfavorable publicity, that preferences to creditors [we]re probable, and that its assets [we]re in danger of dissipation and depletion."  *Id.* at 285.  The trial court granted the plaintiffs a temporary injunction that enjoined the company that administered the trust "from transferring or otherwise disposing of the sum of $38,258.85 representing certain charges, income, and proceeds received in administration of the trust."  *Id.* at 286.  Upon finding that the Securities Act authorized equitable relief and that the plaintiffs had stated a claim for equitable relief, the Supreme Court further concluded that "the injunction was a reasonable measure to preserve the status quo pending final determination of the questions raised by the bill."  *Id.* at 288-90.

In *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.* ("*Grupo Mexicano*"), certain creditors of Grupo Mexicano de Desarrollo S.A. ("GMD"), a Mexican holding company, accelerated the principal owed on notes they held after GMD failed to make payments on the notes and filed a lawsuit against GMD seeking to recover the amount due.  527 U.S. 308, 310-12 (1999).  Upon finding that GMD was "at risk of insolvency if not already insolvent" and that it planned to use certain notes it received from the Mexican government "to satisfy its Mexican creditors to the exclusion of [the plaintiff creditors]," the trial court preliminarily enjoined GMD "from dissipating, disbursing, transferring, conveying, encumbering or otherwise distributing or affecting any [of the plaintiff's] right to, interest in, title to or right to receive or retain, any of the [notes GMD received from the Mexican government]."  *Id.* at 312-13.  On appeal, the Supreme Court considered "whether, in an action for money damages, a United States District Court has

the power to issue a preliminary injunction preventing the defendant from transferring assets in which no lien or equitable interest is claimed." *Id.* at 310.  The Supreme Court observed that "the equity jurisdiction of the federal courts is the jurisdiction in equity exercised by the High Court of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act, 1789 (1 Stat. 73)" and that "[t]he substantive prerequisites for obtaining an equitable remedy as well as the general availability of injunctive relief are not altered by [Federal Rule of Civil Procedure 65] and depend on traditional principles of equity jurisdiction." *Id.* at 318-19 (quotations omitted). Upon finding that an injunction freezing a defendant's assets prior to obtaining a judgement in a case seeking only money damages was "unknown to traditional equity practice," the Supreme Court concluded that "the District Court had no authority to issue a preliminary injunction preventing petitioners from disposing of their assets pending adjudication of respondents' contract claim for money damages." *Id.* at 318-24, 327, 333. The Supreme Court found that its prior decision in *Deckert* was "not on point . . . because, as the [*Deckert*] Court took pains to explain, 'the bill state[d] a cause [of action] for equitable relief.'" *Id.* at 325 (quoting *Deckert*, 311 U.S. at 288).  The *Grupo Mexicano* court further explained that "[t]he preliminary relief available in a suit seeking equitable relief has nothing to do with the preliminary relief available in a creditor's bill seeking equitable assistance in the collection of a legal debt." 527 U.S. at 325.

Courts "have interpreted *Grupo Mexicano* narrowly so as to apply its holding only to actions asserting *solely* legal causes of action or actions involving assets in which *no lien* or other equitable interest in the assets is claimed." *Matrix Partners VIII, LLP v. Nat. Res. Recovery, Inc.*, No. 1:08-CV-547, 2009 WL 175132, at *4 (E.D. Tex. Jan. 23, 2009)

(emphasis in original).  As a result, "in 'mixed' cases wherein both legal and equitable causes of action are asserted, courts have concluded that *Grupo Mexicano* does not preclude issuance of a preliminary injunction to preserve the relative positions of the parties until a trial on the merits can be held." *Id.* (collecting cases).  The most thorough analysis of this position is found in the Fourth Circuit's decision in *United States ex rel. Rahman v. Oncology Assocs.* ("*Rahman*"), 198 F.3d 489 (4th Cir.1999).[21]  *See Newby v. Enron Corp.*, 188 F. Supp. 2d 684, 695 (S.D. Tex. 2002) (observing that "[t]he Fourth

---

[21] The Tenth Circuit has not applied *Grupo Mexicano* or cited *Rahman* in a published decision addressing the Court's inherent authority to issue an injunction freezing a party's assets.  In *Niemi v. Lasshofer*, the Tenth Circuit recognized the Supreme Court's holding in *Grupo Mexicano* that "in cases seeking money judgments, federal district courts do not possess the inherent equitable power to issue preliminary injunctions preventing the transfer of assets in which the plaintiffs claim no pre-existing lien or equitable interest." 728 F.3d 1252, 1257 (10th Cir. 2013).  Although the *Niemi* court indicated that the district court lacked the *inherent* authority to issue the injunction at issue pursuant to *Grupo Mexicano*, because the injunction at issue was issued pursuant to a state statute, the Tenth Circuit found *Grupo Mexicano* inapplicable.  *Id.* at 1258.  In an unpublished decision, the Tenth Circuit applied *Grupo Mexicano* to find that "[a] creditor with no rights to a debtor's property cannot restrain the debtor's use of that property prior to a final judgment." *Prosper, Inc. v. Innovative Software Techs.*, 188 F. App'x 703, 705 (10th Cir. 2006).  Notably, the Tenth Circuit in *Prosper* appeared to take a more expansive view of the Supreme Court's decision in *Grupo Mexicano* than that advocated by *Rahman* and the other courts limiting *Grupo Mexicano*'s application to cases where the plaintiff has not asserted claims in equity/is not seeking equitable relief.  In *Prosper*, the Tenth Circuit applied the *Grupo Mexicano* limitation on the court's authority to issue a preliminary injunction even though the plaintiff had asserted an equitable claim for unjust enrichment and sought equitable relief in the form of specific performance. *Id.* at 704-05 (finding that "[s]eeking specific performance of a contract . . . does not render *Grupo Mexicano* immaterial"); *see also Westar Energy, Inc. v. Lake*, 552 F.3d 1215, 1222 (10th Cir. 2009) ("Specific performance is an equitable remedy.").  Because *Prosper* is an unpublished decision, it is not binding on this Court though the Court may consider it for its persuasive value.  *See United States v. Austin*, 426 F.3d 1266, 1274 (10th Cir. 2005) (noting that, although unpublished decisions "are not binding precedent," they may have "some persuasive value").  Because, for the reasons explained herein, the Court finds that it lacks authority to issue the requested injunction even under the narrower interpretation of *Grupo Mexicano* adopted by *Rahman* and other courts outside the Tenth Circuit, the Court finds it unnecessary to consider whether the Tenth Circuit would adopt a more expansive reading of *Grupo Mexicano* as the Tenth Circuit appeared to do in *Prosper*.

Circuit Court of Appeals has provided the most thorough relevant analysis of *Grupo Mexicano*").

In *Rahman*, the district court "entered a pre-judgment, asset-freezing injunction on the United States' allegations that the defendant oncology service providers defrauded the Medicare and CHAMPUS programs and thereafter were engaging in complex reorganizations and transfers of assets to insulate themselves from liability." 198 F.3d at 492 (footnote omitted). In considering whether the district court had the authority to enter the injunction, the *Rahman* court found that "*Grupo Mexicano*'s holding is carefully circumscribed, providing specifically that the general equitable powers of the federal courts do not include the authority to issue preliminary injunctions in actions solely at law" and that the Supreme Court in *Grupo Mexicano* "was not presented with, nor did it choose to address, a situation in which equitable remedies were claimed." *Id.* at 496.

Based upon the Supreme Court's guidance in *Deckert* and *Grupo Mexicano*, the Fourth Circuit concluded that "where a plaintiff creditor has no lien or equitable interest in the assets of a defendant debtor, the creditor may not interfere with the debtor's use of his property before obtaining judgment," but "when the plaintiff creditor asserts a cognizable claim to specific assets of the defendant or seeks a remedy involving those assets, a court may in the interim invoke equity to preserve the *status quo* pending judgment where the legal remedy might prove inadequate and the preliminary relief furthers the court's ability to grant the final relief requested." *Id.* The Fourth Circuit emphasized that the "nexus between the assets sought to be frozen through an interim order and the ultimate relief requested in the lawsuit is essential to the authority of a district court in equity to enter a preliminary injunction freezing assets." *Id.* at 496-97.

The Fourth Circuit then applied a two-step analysis to determine whether the district court had the authority to enter an order freezing the defendants' assets—first, analyzing the claims "to determine whether they seek cognizable relief in equity involving assets of the defendant" and, second, determining "whether . . . the preliminary injunction freezing assets . . . is a reasonable measure to preserve the *status quo* in aid of the ultimate equitable relief claimed." *Id.* at 497. Conducting this two-step analysis, the Fourth Circuit concluded that "the district court was authorized by its traditional equitable power to issue a preliminary injunction in this action freezing the assets of the defendants" and "[t]hat money damages [we]re claimed along with equitable relief d[id] not defeat the district court's equitable powers." *Id.* at 498, 499.

Numerous courts have applied the analysis set forth in *Rahman* to require a showing that: (1) the plaintiff "seek[s] cognizable equitable relief" and (2) there is "a sufficient nexus between the assets sought to be frozen and the equitable relief plaintiffs request."[22] *Newby*, 188 F. Supp. 2d at 697; *see also id.* at 696 n.6 (collecting cases); *AAAG-California, LLC v. Kisana*, 439 F. Supp. 3d 1265, 1279 (D. Utah 2020) (applying *Rahman* to find authority to issue injunction where plaintiff "established a cognizable claim to specific assets of Defendants and is likely to obtain final equitable relief"); *In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, 243 F. Supp. 2d 1179, 1184 (D. Colo. 2003) (citing *Rahman* for the proposition that "a plaintiff seeking an asset freeze injunction must have asserted an underlying equitable interest in the particular property that is the subject of

---

[22] If the plaintiff succeeds in making this showing, courts also require the plaintiff to demonstrate that the temporary injunction "is a reasonable measure to preserve the status quo in aid of the ultimate equitable relief claimed." *Newby*, 188 F. Supp. 2d at 697; *see also Deckert*, 311 U.S. at 290; *Rahman*, 198 F.3d at 497; *Fairview Mach. & Tool Co. v. Oakbrook Int'l, Inc.*, 77 F. Supp. 2d 199, 204 (D. Mass. 1999).

the proposed injunction"); *Fairview Mach. & Tool Co. v. Oakbrook Int'l, Inc.*, 77 F. Supp. 2d 199, 204 (D. Mass. 1999) (applying *Rahman*); *Wishnatzki & Nathel, Inc. v. H.P. Island-Wide, Inc.*, No. 00 CIV. 8051 (JSM), 2000 WL 1610790, at *1 (S.D.N.Y. Oct. 27, 2000) (finding that court has authority to issue injunction where "the ultimate relief sought was equitable in nature" and "the particular funds sought to be frozen are also the funds at issue in the suit"). Here, although Plaintiff acknowledges that, under *Rahman*, a plaintiff must demonstrate that "the complaint's claims seek cognizable relief in equity involving specific assets of the defendant" [#20 at 6], Plaintiff has not demonstrated that either requirement necessary for the Court to have the authority to issue a preliminary injunction freezing Defendants' assets has been met.

First, the Second Amended Complaint does not seek cognizable equitable relief. Plaintiff's first claim for relief is a claim for breach of contract that seeks only money damages. [#38 at 8-9] The Court's lack of authority to issue an injunction freezing Defendants' assets based upon the first claim for relief thus is clearly established by the Supreme Court's holding in *Grupo Mexicano*. Plaintiff's second claim for relief for fraud also is a claim at law rather than an equitable claim,[23] and Plaintiff again seeks only money damages. [*Id.* at 9-11] As explained above, Plaintiff's third claim for relief pursuant to the doctrine of respondeat superior is derivative of its other two claims and Plaintiff seeks the same, monetary relief. [*Id.* at 11-12] In the Motion for Injunction, Plaintiff contends that "equity measures would be met in the instant case" but then acknowledges

---

[23] *See Ag Servs. of Am., Inc. v. Nielsen*, 231 F.3d 726, 729 (10th Cir. 2000) (distinguishing between "legal claims" and "equitable claims" and listing fraud as a legal claim); *Tenneco Oil Co. v. Joiner*, 696 F.2d 768, 776 (10th Cir. 1982) (distinguishing between "action[s] at law" and claims that "arise[ ] under equity jurisprudence" and identifying fraud as an action at law).

that Plaintiff is only seeking monetary damages.  [#20, ¶ 20]  Plaintiff fails to explain or cite any authority to support a finding that the request for monetary damages for a breach of contract and/or fraud constitutes "cognizable equitable relief" and the Court is aware of none.  Similarly, in Plaintiff's reply in support of the Motion for Injunction, Plaintiff argues that it "has equitable interests," because "there is a joint venture vice [sic] a contractual dispute, [and] the Defendants intentionally misled and defrauded Plaintiff."[24]  [#48 at 5; *see also id.* at 6 (attempting to distinguish *Grupo Mexicano*, because Plaintiff here "asserts fraud in addition to breach of contract" and has alleged "facts that show the propensity of Defendant to engage in fraudulent activity")]  Plaintiff, however, again provides no explanation or authority to support a finding that the existence of a joint venture and/or allegations of fraud convert claims seeking only money damages into claims for "cognizable equitable relief" and the Court is aware of none.[25]  The Court thus finds that Plaintiff has not asserted a claim for cognizable equitable relief.

---

[24]  Plaintiff also states—without citation to the record or any legal authority—that "Defendant [sic] has been unjustly enriched."  [#48 at 5]  Plaintiff, however, has not asserted a claim for unjust enrichment in the Second Amended Complaint as an alternative to its claim for breach of contract.  *See W. Ridge Grp., LLC v. First Tr. Co. of Onaga*, 414 F. App'x 112, 120 (10th Cir. 2011) (finding that an unjust enrichment claim "is not available as a mere alternative legal theory when the subject is covered by an express contract") (citing *Interbank Invs., LLC v. Eagle River Water & Sanitation Dist.*, 77 P.3d 814, 819 (Colo. App. 2003)).

[25]  Plaintiff's reliance on *National Union Fire Ins. Co. v. Kozeny (Kozeny III)* is misplaced. [#48 at 6 (citing 115 F. Supp. 2d 1243, 1250 (D. Colo. 2000)]  As an initial matter, the preliminary injunctions at issue in *Kozeny III* were granted pursuant to a state statute and thus are not subject to the limitations on the Court's authority discussed in *Grupo Mexicano*.  *See Nat'l Union Fire Ins. Co. v. Kozeny* ("*Kozeny I*"), 115 F. Supp. 2d 1210, 1231 (D. Colo. 2000) (granting preliminary injunction "pursuant to the Colorado Organized Crime Control Act, § 18–17–106(1)"), *aff'd*, 19 F. App'x 815 (10th Cir. 2001); *Nat'l Union Fire Ins. Co. v. Kozeny* ("*Kozeny II*"), 115 F. Supp. 2d 1231, 1242 (D. Colo. 2000) (same), *aff'd sub nom.* 19 F. App'x 815 (10th Cir. 2001); *Niemi*, 728 F.3d at 1258 (holding that the limitations on the Court's inherent authority set forth in *Grupo Mexicano* are inapplicable to injunctions issued pursuant to the Colorado Organized Crime Control Act).  Moreover, the plaintiffs in *Kozeny* asserted equitable claims seeking equitable relief.  *See Kozeny*

Second, Plaintiff has not demonstrated a sufficient nexus between the assets sought to be frozen and the equitable relief plaintiff requests.  Here, as noted above, Plaintiff seeks an injunction freezing *all* of Defendants' assets yet Plaintiff seeks only monetary damages.  With the exception of one bank account,[26] Plaintiff makes no attempt to establish a nexus between the specific assets it seeks to freeze and Plaintiff's claims.[27] Instead, Plaintiff seeks to freeze all of Defendants' assets, because "[i]f Defendants['] assets are not frozen Plaintiff will most likely not be able to recover any funds" if it succeeds in obtaining a judgment.  [#20, ¶ 16]  Such a contention is insufficient to establish the nexus necessary to support the Court's authority to issue an injunction freezing Defendants' assets.  "The fact that [Plaintiff] seeks a specified amount of money

---

*II*, 115 F. Supp. 2d at 1234 (identifying claims for unjust enrichment and constructive trust asserted against all defendants).  With this context, the Court disagrees with Plaintiff's contention that *Kozeny III* "held that *Grupo* [*Mexicano*] was distinguishable because *Grupo* [*Mexicano*] concerned whether the court could enjoin assets in which the potential judgment creditor had no equitable interest, but the plaintiffs in [*Kozeny III*] introduced evidence showing a strong nexus between the assets enjoined and plaintiffs' claim for money damages."  [#48 at 6]  Plaintiff's contention conflates two separate requirements for the Court's authority to enter an injunction—(1) the plaintiff asserts a claim for "cognizable equitable relief" and (2) there is a sufficient nexus between the assets sought to be frozen and the equitable relief the plaintiff requests.

[26] In the Motion for Injunction, Plaintiff, without citation to evidence, contends that it "has been able to identify . . .  bank account information for Mr. Guo in their prior dealings"—which bank account is identified as a Wells Fargo account ending in 1495—and that the "account was specifically used by Mr. Guo in connection with this [sic] dealing with Plaintiff."  [#20, ¶ 12]  Notably, Plaintiff does not offer any information regarding when or how the Wells Fargo account was used.  The Court finds Plaintiff's vague and unsupported statement insufficient to establish the requisite nexus.

[27] In Plaintiff's reply in support of the Motion for Injunction, Plaintiff states that "there is an exact nexus between the assets Plaintiff seeks to enjoin, monies wrongfully received by Defendants for products paid for entirely by Plaintiff, and Plaintiff's claim that Defendants fraudulently deprived Plaintiff of the funds due through their deceit."  [#48 at 6]  Plaintiff, however, seeks to enjoin *all* of Defendants' assets not only "monies wrongfully received by Defendants for products paid for entirely by Plaintiff" and, moreover, Plaintiff has not offered any specific factual allegations or evidence connecting the allegedly wrongfully received monies to the assets sought to be frozen.

. . .  does not render that same dollar amount of [Defendants'] assets *related to the underlying dispute* for the purposes of [the Court's] analysis." *Prosper, Inc.*, 188 F. App'x at 705 (emphasis in original); *see also In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, 243 F. Supp. 2d at 1185 (finding that "court does not have the authority to issue an injunction freezing the . . .  assets because the plaintiffs have not asserted an equitable claim with a sufficient nexus to those assets" where "[n]othing in the record indicate[d] that . . . plaintiffs . . . ha[d] a particular or specific equitable claim traceable to the . . . assets"); *Newby v. Enron Corp.*, 188 F. Supp. 2d at 707-08 ("A prejudgment asset freeze is not available in a case simply because the potential equitable award is likely to exceed available assets").  The Court thus concludes that Plaintiff has not established a sufficient nexus between Defendants' assets sought to be frozen and the relief Plaintiff seeks.

Accordingly, the Motion for Injunction is DENIED.

## III.   CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Injunctive Relief to Freeze the Assets of Defendants [#20] and Defendants' Motion to Dismiss Second Amended Complaint [#45] are **DENIED**.

DATED: August 19, 2021                    BY THE COURT:

                                          s/Scott T. Varholak
                                          United States Magistrate Judge